Filed 6/16/15  P. v. Green CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D065574 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD241455) |
| SCOTT MICHAEL GREEN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, David M. Gill, Robert S. Drake, Judges.  Affirmed.

Marianne Harguindeguy, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Senior Assistant Attorney General, Eric A. Swenson and Ryan H. Peeck, Deputy Attorneys General, for Plaintiff and Respondent.

Scott Green appeals from a judgment convicting him of transportation and possession for sale of methamphetamine.  He challenges the trial court's denial of his

motion to suppress evidence, contending the court erred by (1) finding the police had a reasonable suspicion to justify stopping his vehicle, and (2) excluding defense evidence proffered at the suppression hearing that would have impeached the officers' testimony. Defendant also argues the court erred by denying his motion to represent himself at trial. We find no reversible error and affirm.

FACTUAL AND PROCEDURAL BACKGROUND

At about 1:30 a.m. on June 12, 2012, Deputy Sheriffs Robert Roberson and Chad Dollick conducted a traffic stop of defendant. When speaking with defendant, Deputy Roberson smelled a heavy marijuana odor coming from inside the vehicle. The officer instructed defendant to exit his car, and obtained defendant's permission to search his person. In defendant's pockets, the officer found a "fake plastic rock" and a glass pipe used for smoking methamphetamine. The officer arrested defendant, and during a further search of his pockets found a small baggie containing methamphetamine and a handheld digital scale. Defendant's wallet contained $517 cash, including 25 twenty-dollar bills, three five-dollar bills, and two one-dollar bills. He also had a medical marijuana card in his wallet, and in the car there were two baggies containing marijuana and a pipe for smoking marijuana.

The plastic rock (a "hide-a-key" container) found in defendant's pocket contained 28.02 grams of methamphetamine, and the small baggie of methamphetamine found in his pocket contained 1.39 grams of methamphetamine. A prosecution expert testified that a heavy methamphetamine user typically would carry no more than 3.5 grams of methamphetamine for personal use, whereas methamphetamine sellers generally possess

2

larger quantities. Methamphetamine sellers who sell on the street typically price the drugs in "$20 units" so the transactions can be accomplished quickly, and thus they tend to carry cash in 10- and 20-dollar denominations. When provided a hypothetical based on the items found in defendant's possession, the expert stated that 28 grams of methamphetamine was "an enormous amount of meth for any one person to possess." The expert opined the methamphetamine in the plastic rock was possessed for sale, and the smaller amount in the baggie was for personal use.

Defendant was convicted of transportation of methamphetamine with a finding that it was not for personal use, and possession for sale of methamphetamine. The court imposed a 180-day jail sentence and placed defendant on three years of formal probation.

DISCUSSION

I. *Denial of Motion To Suppress Evidence*

Prior to trial, defendant filed a motion to suppress the evidence seized by the officers, which the trial court denied. On appeal, he does not dispute that if he was lawfully stopped by the officers, they properly seized the evidence supporting his convictions. However, he challenges the propriety of the initial stop, contending that, contrary to the officers' claims, they did not have a reasonable suspicion that his vehicle was emitting loud music in violation of the Vehicle Code. Additionally, he contends the court denied him a fair hearing when it curtailed his presentation of additional evidence to show his vehicle was incapable of making the loud music.

3

*Background*

At the hearing on the suppression motion, the prosecution presented testimony from the two officers who stopped defendant (Deputies Roberson and Dollick). Defendant also testified on his own behalf to describe his version of the events.

*The Officers' Testimony*

At the time of the stop, Deputies Roberson and Dollick were patrolling Highway 67 in separate patrol vehicles. They were looking for "probable cause" to stop vehicles for Vehicle Code violations, anticipating that they might uncover more serious offenses as a result of the stops. They had just finished a stop of a female who had been speeding southbound on the highway, when they noticed defendant driving northbound on the highway with "very loud music" playing.

The officers had stopped the female driver on the southbound side of Highway 67 between two roads that intersect the highway (Poway Road on the north and Scripps Poway Parkway on the south).[1] The officers first noticed defendant's vehicle when it was about 100 yards away from them, traveling northbound on the opposite side of Highway 67 from the direction of the Scripps Poway Parkway intersection. The music coming from defendant's car was making a "loud, booming bass" sound. As defendant's

---

[1]   According to Deputy Dollick, the officers were stopped with the female driver on Highway 67 about 100 yards north of the Scripps Poway Parkway intersection. In contrast, Deputy Roberson testified they were not close to the Scripps Poway Parkway intersection, but rather they stopped the female "a couple hundred yards" south of Poway Road. Defendant agreed with Deputy Dollick's description, testifying the officers were about 300 to 400 yards north of the Scripps Poway Parkway intersection when he passed by them. Poway Road and Scripps Poway Parkway are about one and 3/4 miles apart.

4

car approached the officers, the music sounded louder, and as his vehicle moved further past them, the music sounded quieter. The officers decided to stop defendant because he was violating Vehicle Code section 27007, which prohibits playing music that can be heard outside the car from a distance of 50 feet or more.

The officers got in their cars and made a U-turn on Highway 67 so they could follow defendant in a northerly direction. The officers activated their overhead lights, and in response defendant pulled over and stopped his car a short distance north of the Poway Road intersection. Deputy Roberson approached defendant's car and told him they stopped him because of "the loud music." After noticing the strong marijuana odor, he conducted a pat-down search, obtained defendant's consent to search, and discovered the various drug-related items.

Deputy Roberson testified he did not recall hearing the music when he pulled defendant over and he thought the music had been turned off, and the last time he heard the music was immediately prior to getting in his patrol vehicle to follow defendant. The officers did not inspect the speaker system of defendant's car, and they did not recall if the car had "subwoofers" installed that create a loud bass sound. Deputy Roberson testified the loud bass sound coming from defendant's vehicle sounded like it could be from a car with subwoofers, but a car does not need aftermarket subwoofers or speakers to project this level of loud music and the sound could have been coming from the car's stock stereo system.

Deputy Roberson testified he was certain they stopped defendant's vehicle for loud music, and Deputy Dollick testified the music "followed [defendant's] vehicle." The

5

officers stated that apart from the patrol cars, the only two vehicles on the road were the female's stopped vehicle and defendant's vehicle, and no other cars arrived on the scene as defendant's vehicle was driving away from them. Deputy Dollick acknowledged it was possible there could have been another car with loud music next to defendant's car at the Scripps Poway Parkway intersection before defendant turned onto the highway. However, Deputy Dollick stated if this other driver turned in the opposite direction from defendant (as claimed by defendant, see below), the other car would have been out of the officers' view when defendant's vehicle passed directly by the officers on the highway. Deputy Dollick did not think the music he heard could have been coming from this other car.

*Defendant's Testimony*

Defendant testified he was stopped at the Scripps Poway Parkway intersection before turning onto Highway 67, and there was a white Suburban next to him playing loud "booming" rap music. The Suburban turned right (south on Highway 67), and defendant turned left (north on Highway 67). As defendant drove into the intersection and continued driving north, he saw the police had pulled someone over. He testified his car had a "regular stereo" with front speakers; the back speakers did not work; and he had no subwoofers or other "big amplification system" in the car. He acknowledged he liked to listen to rap music, and stated his front speakers were "aftermarket" speakers, and when they are played at a particular loudness they "distort" the sound.

Defendant testified the officer told him he was stopped " 'because of [his] stereo.' " Defendant told the officer his music was not on loud, whereas there was loud music

6

coming from a white Suburban that had turned right on the highway.  Defendant testified that when the defense team inspected his vehicle, the back speakers were not hooked up or working.  Based on various tests performed at the direction of the defense team, defendant did not think music from his car played at the highest volume could be heard more than 10 feet away.

*Trial Court's Limitation of Defense Evidence*

At the conclusion of the first day of the suppression hearing, defense counsel told the court that he would be requesting that the court view defendant's vehicle.  The prosecutor objected, stating there was no showing the car was currently in the same condition as it was at the time of defendant's arrest.  The court stated it would address this matter when it actually came up.

At the next hearing date, defense counsel elicited testimony from defendant about the limits on his car's speaker capacity (as set forth above) and elicited some additional testimony from defendant on this subject, including questions about the specific testing performed and the people involved in the testing.  During defendant's testimony on this matter, the court told defense counsel to "cut to the chase," explaining that it had other proceedings waiting to be heard; it did not need to hear all the details or testimony from other witnesses about the testing of defendant's vehicle; it was willing to accept that the Suburban was the source of the music and the officers made a mistake; and that this assumption did not defeat reasonable suspicion for the stop.  After inquiring whether the court would accept that defendant's car was not in a condition that could generate music that could be heard by the officers, and based on the court's statement that it was willing

7

to assume the music came from the Suburban, not defendant's car, defense counsel stated he would stop his examination on this issue.

*Trial Court's Ruling*

At the conclusion of the evidentiary presentation, defense counsel acknowledged that a good faith mistake by the officers would not defeat reasonable suspicion, but argued there was no good faith mistake here. Rather, defense counsel asserted the officers were looking for reasonable suspicion to make stops; they "heard music coming up at the intersection"; when defendant's car came past them they saw it fit the profile of "a perfect kind of car to stop"; and the loud music from the Suburban gave them the idea to fabricate stopping defendant's car for loud music.[2]

In opposition to the suppression motion, the prosecutor argued if the music was coming from the Suburban, it would not have sounded louder as defendant drove closer to the officers and would not have sounded quieter as he drove past them. Alternatively, the prosecutor contended that even if the music might have been coming from the Suburban, the officers "truly believe[d]" it was coming from defendant's vehicle and their mistaken belief satisfied the reasonable suspicion required for the stop.

After hearing counsels' arguments, the court stated that the "more probable, credible evidence comes from the two deputy sheriffs . . . that the music was coming from . . . the defendant's car." Alternatively, the court concluded that if the officers were

---

[2]    Defense counsel explained the profile was based on the early morning hour of 1:30 a.m. and the car being an "older two-door Honda" with "a guy in it," which suggested "a young guy's car that might be doing dope or drinkin[g]."

mistaken, this did not defeat reasonable suspicion for the stop.  Accordingly, the court

denied the suppression motion.

*Relevant Law*

To comport with the Fourth Amendment prohibition against unreasonable

searches and seizures, the police may not conduct a traffic stop unless there is a

reasonable suspicion that the driver has violated the Vehicle Code or some other law.

(*People v. Durazo* (2004) 124 Cal.App.4th 728, 734-735.)  Reasonable suspicion requires

" 'a particularized and objective basis for suspecting the particular person stopped' of

breaking the law."  (*Heien v. North Carolina* (2014) __ U.S. __ [135 S.Ct. 530, 536]

(*Heien*).)  The required reasonable suspicion can be based on an "officer's mistaken

factual belief, held reasonably and in good faith . . . ."  (*People v. White* (2003) 107

Cal.App.4th 636, 644.)  As explained in *Heien*, " '[T]he ultimate touchstone of the Fourth

Amendment is "reasonableness." '. . . To be reasonable is not to be perfect, and so the

Fourth Amendment allows for some mistakes on the part of government officials, giving

them 'fair leeway for enforcing the law in the community's protection.' [Citation.]  We

have recognized that searches and seizures based on mistakes of fact can be reasonable."

(*Heien, supra*, 135 S.Ct. at p. 536.)

However, the "Fourth Amendment tolerates only *reasonable* mistakes, and those

mistakes—whether of fact or of law—must be *objectively* reasonable."  (*Heien, supra*,

135 S.Ct. at p. 539.)  The relevant inquiry is "whether the officer's conduct under the

circumstances known to him was objectively reasonable. . . . [¶] . . . [T]he People ' "must

be able to point to specific and articulable facts which, taken together with rational

9

inferences from those facts, reasonably warrant that intrusion. . . . And in making that assessment it is imperative that the facts be judged against an objective standard; would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" ' " (*People v. Glick* (1988) 203 Cal.App.3d 796, 801.)

On appeal, we defer to the trial court's express and implied findings if they are supported by substantial evidence, and, on the facts so found, exercise our independent judgment in determining the constitutionality of the search or seizure. (*People v. Tully* (2012) 54 Cal.4th 952, 979.) The trial court " 'is vested with the power to judge the credibility of the witnesses, resolve any conflicts in the testimony, weigh the evidence and draw factual inferences in deciding whether a search [or seizure] is constitutionally unreasonable.' " (*Ibid*.) We review the trial court's factual findings under the deferential substantial evidence standard, viewing the evidence in the light most favorable to the court's order. (*Ibid*.)

*Analysis*

When denying the suppression motion, the trial court made two findings: (1) it credited the officers' claim that the music was coming from defendant's vehicle; and (2) it found that even if the officers were mistaken and the music was coming from the Suburban, their mistake did not defeat the reasonable suspicion for the stop.

There was no error in these rulings. The court was entitled to credit the officers' claims that they believed the music was coming from defendant's vehicle. Further, the court could reasonably find that even if the music was actually coming from the

10

Suburban, the officers had a reasonable (albeit mistaken) basis to think it was coming from defendant's vehicle. As described by defendant, his car and the Suburban were next to each other at the intersection of Highway 67 and Scripps Poway Parkway in relatively close proximity to where the officers were located; his car turned north on the highway in the direction of the officers; and the Suburban turned south on the highway in the direction away from the officers. Even though the Suburban did not pass directly by the officers on Highway 67, the court could assess that the precise source of noise can be difficult to determine, and the music emanating from the Suburban could have sounded as if it was following defendant's car. The court could deduce that in the quiet of the late night hour, the music from the Suburban could have traveled across the intersection to the nearby locale where the officers were standing several hundred yards away, sounded louder to the officers as the Suburban moved through the intersection closer to the officers, and then sounded quieter as the Suburban drove south away from the officers. Further, the officers could have mistakenly attributed the sound to defendant's vehicle because it was the one that passed directly by them on the highway. Also, the court could consider that the officers' ability to determine precisely where the music was coming from may have been affected by the fact the officers were on the southbound side of the highway at some distance from defendant's vehicle on the northbound side.

To support his claim of error, defendant raises a variety of challenges to the court's ruling, including that (1) it was unreasonable for the court to credit the officers' claims because of inconsistencies in their testimony concerning such matters as the exact location and manner in which the stops were conducted; (2) the court did not evaluate

11

whether it would have been reasonable for the officers to mistakenly think the music was coming from his car rather than the Suburban; and (3) the court prevented defense counsel from fully presenting the evidence showing his car was incapable of making music loud enough to be heard from a substantial distance, which would have significantly impeached the officers' credibility.

The fact that there were some inconsistencies in the officers' testimony does not show the court's ruling was incorrect. It is the exclusive province of the trier of fact to decide a witness's credibility; the fact finder may accept as true only part of a witness's testimony and disregard the rest; and a witness is incredible as a matter of law only if the matters testified to by the witness are physically impossible or inherently improbable. (*People v. Young* (2005) 34 Cal.4th 1149, 1181; *In re Daniel G.* (2004) 120 Cal.App.4th 824, 830.) Although there were some differences in the officers' descriptions of exactly where they stopped the female for speeding and the manner in which they followed defendant, they were of minor consequence.[3] Both officers agreed on the essential claim

---

3    As noted earlier (see fn. 1, *ante*), Deputy Roberson stated they stopped the female on Highway 67 close to the Poway Road intersection, whereas Deputy Dollick stated they stopped her on Highway 67 close to the Scripps Poway Parkway intersection. Also, there were slight differences (which were not necessarily inconsistent with each other) in the officers' descriptions of how they activated their lights and followed defendant before he pulled over. Deputy Roberson testified they stopped defendant's vehicle "not . . . long[ ] after" they started following him and defendant pulled over "pretty quickly once [they] activated [their] overhead lights." Deputy Dollick testified that they sometimes follow Vehicle Code violators without immediately turning on their lights to see if they are driving erratically, and they followed defendant "some distance prior to . . . using the lights to pull him over." Both officers testified they pulled defendant over a short distance north of the Poway Road intersection.

that they heard loud music coming from defendant's vehicle and for this reason they followed him and stopped him.

We also find no error based on defendant's claim that the court did not evaluate the reasonableness of a mistaken belief that the music was coming from defendant's vehicle. Although the court did not expressly refer to this matter, its consideration of the issue is implicit. Defense counsel argued the officers heard the music from the Suburban and this gave them the idea to claim it was coming from defendant's car so they could stop his car on a profile-based hunch. In contrast, the prosecutor argued even if the officers were mistaken and the music was coming from the Suburban, they could properly make the stop based on their belief defendant's car was the source of the music. Thus, the court was squarely faced with resolving the competing claims of whether the officers were fabricating their claims or were honestly reporting their perceptions. We are satisfied the court would not have rejected the defense fabrication claim without considering whether it was plausible and reasonable for the officers to have been mistaken about the source of the music considering all the circumstances.

We also reject defendant's claim of error based on the court's decision to limit the amount of evidence from the defense concerning its claim that the speakers in defendant's car were not capable of producing extremely loud music. A defendant's constitutional right to a fair trial includes the right to present all relevant evidence that is of significant value to the defense case. (*People v. Cunningham* (2001) 25 Cal.4th 926, 999.) However, a trial court has the discretion to exclude cumulative evidence that is not of significant import to the defense case. (*Ibid*.; *People v. Ramos* (2004) 34 Cal.4th 494,

13

529; *People v. Mincey* (1992) 2 Cal.4th 408, 439-440.) Here, the court allowed defense counsel to elicit testimony from defendant that his car was incapable of emitting music loud enough to violate the Vehicle Code. The court then curtailed additional evidence on this point based on its assessment that even assuming the music was coming from the Suburban, this would not alter its finding of reasonable suspicion. The court reasonably exercised its discretion to limit cumulative evidence that was presented by defendant's testimony and that had no ultimate effect on the outcome of the suppression hearing.

Moreover, even assuming the court should have allowed more evidence to be presented concerning the car's sound capabilities, any error was harmless. Because the court's ruling did not completely deprive the defendant of an opportunity to present a defense, we apply the state law standard for error, inquiring whether there is a reasonable probability the outcome would have been more favorable to the defendant absent the error. (*People v. Boyette* (2002) 29 Cal.4th 381, 428-429.) Because the court found that the officers could have reasonably, but mistakenly, believed the music was coming from defendant's car, there is no reasonable probability the court's ruling would have been different even if the defense had conclusively established defendant's car could not have been the source of the music.

We are also unpersuaded by defendant's contention that additional evidence concerning the sound capability of his car would likely have changed the court's ruling because the evidence would have been highly detrimental to the officers' overall credibility given their insistence that the music came from defendant's car. The court stated that it found the officers credible, and that the showing of reasonable suspicion was

14

not defeated even if the officers were mistaken about defendant's car being the source of the music. Because the court expressly set forth an alternative ruling based on the assumption that the Suburban was emitting the music, there is nothing in the record to suggest its overall credibility finding would have been different if the defense had presented additional evidence definitively showing the officers were mistaken.

Finally, to the extent defendant posits the trial court was required to discredit the officers because they admittedly were looking for Vehicle Code violators in the hopes of finding more serious offenders, the contention is unavailing. Although the trial court could properly consider the officers' subjective motives for purposes of evaluating their credibility, the court was ultimately entitled to find the existence of reasonable suspicion based on the showing that there was a reasonable, objective basis to perceive the existence of a traffic violation. (See *Whren v. United States* (1996) 517 U.S. 806, 812-813 [officer's subjective motive does not invalidate search involving objectively justifiable behavior]; *United States v. Wilkinson* (10th Cir. 2011) 633 F.3d 938, 943; *United States v. Freeman* (6th Cir. 2000) 209 F.3d 464, 467-468 (conc. opn. of Clay, J.).)

## II. *Denial of Motion for Self-representation*

Defendant contends the trial court abused its discretion when denying his request to represent himself at trial.

### *Background*

On the day trial was set to commence, defendant told the court that he wanted to represent himself. However, upon inquiry by the court, defendant said he would not sign the required written waiver form. The court then questioned defendant in some detail

15

about his refusal to sign the written waiver, explaining that it could not allow him to represent himself if he did not sign the written waiver and it was concerned about defendant's refusal to sign the waiver.

During this discussion, defendant told the court, "*I'm not waiving any of my Sixth Amendment rights*. She[] [referring to defense counsel] [has] already advised me, but she does not have the right to represent me." (Italics added.) The court delineated some of the consequences of self-representation and inquired about defendant's education level (defendant said he had "some college history").[4] After the court asked defendant if he could read and write English, and defendant answered yes, the court again queried, "But *you're still not willing to sign a form to that effect, that you understand the consequences of representing yourself*?" (Italics added.) Defendant responded, "*Correct. I don't want to waive any of my Sixth Amendment rights. I want advice only. I don't need representation. It's my right to have advice, but not representation. I'm not waiving my Sixth Amendment rights*." (Italics added.)

At this juncture defense counsel told the court that she did not think defendant was "*aware that if he goes pro. per. that he's not guaranteed to get advice from counsel*." (Italics added.) The court then explained to defendant that it would not appoint advisory counsel in his case, and if he represented himself he "would be totally on [his] own."

---

4    The court told defendant that he should know the maximum possible punishment; he would not get any special treatment; he would have the right to question the witnesses and call his own witnesses; he would be up against a skilled attorney; he would not have to testify; if he was disruptive, self-representation could be terminated; he could not claim incompetency of counsel on appeal; and he would have the right to act as his own attorney as long as he followed the normal guidelines for attorneys.

When the court again inquired "you're not willing to sign a form to that effect," defendant responded by "shaking his head" (indicating no).

The court then ruled, "I don't think the court is going to let you represent yourself, sir. I'm getting a funny sense, based on the way you're acting and the statements you make and the way you say them that you're somewhat aware of what's going on but *you don't seem to really fully understand what's going on*. That concerns the court, and I think it would be a disaster if you represented yourself." (Italics added.)

*Analysis*

A defendant has a constitutional right to represent himself provided that he knowingly and intelligently waives his Sixth Amendment right to the assistance of counsel. (*People v. Burgener* (2009) 46 Cal.4th 231, 240-241.) A defendant seeking self-representation " ' "should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that '*he knows what he is doing and his choice is made with eyes open*.' " ' " (*Id*. at p. 241, italics added.) The court has a "duty to ensure a defendant ' "actually . . . understand[s] the significance and consequences" of the decision' to waive counsel . . . ." (*Id.* at p. 243.) In appropriate cases, the trial court should ensure that the defendant understands that there is no right to standby or advisory counsel. (*Ibid*.) On appeal, we independently examine the entire record to determine whether the defendant knowingly and intelligently invoked his right to self-representation. (*Id.* at p. 241.)

During the discussion of defendant's self-representation request, defendant told the court that he would not sign the waiver form; he would not waive his "Sixth Amendment

17

rights"; and it was his right to have counsel to advise him even though he did not want to be represented by counsel. The trial court explicitly told him that advisory counsel would not be appointed in his case, and defendant still indicated his unwillingness to sign the waiver form.

These circumstances demonstrate that defendant was refusing to sign the waiver form because he wanted to retain the right to receive advice from counsel. This reflected that he did not understand, or was refusing to accept, that he lost his right to advice of counsel upon electing self-representation. Absent an understanding that he was not entitled to advice from counsel, he cannot be found to have chosen self-representation with a full awareness of the consequences. The trial court properly denied his self-representation request based on the showing that he had not knowingly and intelligently waived his right to the assistance of counsel.

## DISPOSITION

The judgment is affirmed.


HALLER, J.

WE CONCUR:


BENKE, Acting P. J.


NARES, J.

18